

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PT:CP:TK

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 7, 2013

<u>By ECF and Fax</u>

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:   <u>United States v. Pedro Gautier Espada</u>
           <u>Criminal Docket No. 10 Cr. 00985 (FB)</u>

Dear Judge Block:

      The defendant Pedro Gautier Espada ("Gautier Espada") is scheduled to be sentenced on June 14, 2013. On October 12, 2012, Gautier Espada pleaded guilty to a two-count misdemeanor information charging him with stealing less than $1,000 of government funds in violation of 18 U.S.C. § 641, and failing to file a personal income tax return for the year 2009, in violation of 26 U.S.C. § 7203. The Presentence Investigation Report ("PSR") states that the defendant's Guidelines calculation yields an adjusted offense level of 20 and a criminal history category of I, with a corresponding range of imprisonment of 33 to 41 months. PSR ¶ 116. However, because the statutory maximum the defendant faces is 24 months, the effective Guidelines range is 24 months. <u>Id</u>. Probation effectively recommends an 18-month sentence: one-year on the tax count, to run consecutively to 6 months on the theft count. The government agrees with the Probation Department's recommendation for a sentence of 18 months' imprisonment.[1] We also ask that the Court hold the defendant accountable for $988 in restitution for the "double-dipping" scheme described below, and $15,628 in restitution to the IRS for taxes owed for the years 2004 through 2011.

I.   <u>Factual Background</u>

      At trial, the government proved that between 2005 and 2009, Gautier Espada embezzled or otherwise improperly extracted

---

    [1] The parties' plea agreement does not prohibit the government from taking a position as to where Gautier Espada is sentenced within the Guidelines range determined by the Court.

thousands of dollars from the Soundview Healthcare Network ("Soundview"), mainly as a result of his privileged position as the eldest son of Soundview's CEO and President, Pedro Espada, Jr. ("Espada" or "Pedro Espada").[2] Further, Gautier Espada did not report certain income he earned during this period and failed to file a personal income tax return for 2009 knowing he was required to do so.

A. <u>Gautier's Participation in Pedro Espada's Theft Schemes</u>

Gautier Espada served as Soundview's Director of Environmental Care. He also ran the day-to-day operations of the janitorial companies Community Expansion Development Corp. ("CEDC") and Soundview Management Enterprises ("SME"). Evidence at trial demonstrated by a preponderance of the evidence that while Gautier Espada's father masterminded and primarily benefitted from numerous schemes to defraud Soundview, Gautier Espada also benefitted from some of the schemes and played a role in helping his father carry some of them out. The particular schemes in which Gautier Espada was involved included: (1) the Rent Scheme; (2) the CEDC Scheme; and (3) the Miscellaneous Thefts Scheme.

1. <u>The Rent Scheme: Loss of $254,820</u>

Gautier Espada's participation in the rent scheme allowed both Espada and Gautier Espada to improperly divert hundreds of thousands of dollars from Soundview to janitorial companies that Espada controlled and from which Gautier Espada earned tens of thousands of dollars.

First, Gautier Espada was directly involved in arranging illegal rent payments. Witness Maxwell Noble testified that he entered into an arrangement with Gautier Espada to pay him $500 per month so that Noble could use Soundview's conference room to hold services for a church to which he belonged. <u>See</u> Trial transcript from <u>United States v. Espada, et. al</u>, 10 CR 985 (FB) ("Tr.") at 3376-82. Noble testified that he paid cash each month to use Soundview's conference room but that Gautier Espada refused to provide him with a receipt for those payments. <u>Id</u>. at 3389. Noble also testified that there were no maintenance costs associated with his use of the conference room because Noble, a janitor himself, cleaned the room after he used it. <u>Id</u>. at 3392-94.

---

[2] The jury did not return a verdict as to Gautier Espada. However the government proved such conduct by a preponderance of evidence and the Court should consider this conduct when fashioning an appropriate sentence.

3

Beyond the collection of rental payments, Gautier Espada was an indispensable part of the execution of the overall scheme because his father used the ruse of maintenance fees to hide the rental payments he collected. This meant that the person in control of the building's maintenance staff — who knew that janitors cleaned subtenants' spaces as part of their normal duties and that subtenants' payments to CEDC were not for maintenance costs — had to be someone who could be counted on not to alert auditors, investigators or the subtenants themselves to the scheme's existence. By anointing Gautier Espada as both the day-to-day head of CEDC and Soundview's Director of Environmental Care (and rewarding him handsomely for both jobs), Espada ensured that the rent scheme went undetected for years. Seen this way, Gautier Espada not only directly furthered the rent scheme with his own deeds, but ensured that the wider scheme continued through his complicity.

Through the testimony of IRS Special Agent Yves Hunziger, the government established at trial that $254,820 was diverted from Soundview as a result of the rent scheme. Tr. at 4385; PSR ¶¶ 31, 44 and 46. Because Gautier Espada aided and abetted Espada's execution of this scheme, the loss amount associated with the scheme should be included in his offense level computation.

2.   The CEDC Scheme: Loss of $44,576

Gautier Espada significantly benefitted from and helped further his father's scheme to use CEDC to siphon Soundview's funds. First, evidence at trial showed that a main reason for diverting funds to CEDC was simply to provide Gautier Espada with living expenses as well as an extra salary. As Soundview's Director of Environmental Care, Gautier Espada was responsible for ensuring the cleanliness of Soundview's facilities. At the same time, he was employed by CEDC to manage its janitorial staff and ensure that they properly cleaned Soundview. Thus, Gautier Espada received two salaries for doing the same job. Since CEDC received the lion's share of its money from Soundview, this meant that, in reality, Soundview paid twice for the same service.[3]

The evidence at trial also revealed that Gautier Espada used CEDC as a slush fund to cover virtually every conceivable expense one might incur, even personal expenses having nothing to

---

[3] Ironically, Gautier Espada also served as the Chairman of Soundview's Compliance Committee, a position meant to ensure the absence of inappropriate conflicts of interest at Soundview, among other things. Tr. at 514.

4

do with either job. For example, CEDC paid for Gautier Espada's vehicle and gasoline even though witnesses testified that he almost never used his car for CEDC business. Tr. 619, 3096. CEDC also paid for virtually all of Gautier Espada's meals — down to the coffee he bought on the way to work each morning — many of which meals could not have been job-related because they took place on weekends or were delivered to his Connecticut home. See, e.g., Tr. 4072-5; Gx 127.[4] Worse, when Gautier Espada annotated the receipts for meals eaten on weekends or delivered to his home for reimbursement, he falsely listed that the meals represented CEDC-related client meetings or were for other legitimate-sounding business purposes. Gx 127. Gautier Espada also purchased a dress for his wife and assorted personal hygiene supplies for which he caused CEDC to reimburse him, and falsely listed the items as business expenses. Tr. 4068-99; Gx 127.

In addition, Gautier Espada used CEDC checks to pay for thousands of dollars in tutoring fees for his children and stepchildren. These same children also received CEDC checks as gifts and Gautier Espada wrote thousands of dollars worth of CEDC checks to himself in addition to his regular CEDC salary. Because Gautier Espada paid janitors the minimum wage and provided them with no benefits, there was more money available for Gautier Espada to spend on himself. See, e.g., Tr. at 2093-4.

This evidence reveals Gautier Espada's keen awareness that CEDC existed so that he and his father could obtain Soundview's funds above and beyond what they were entitled. There was no reason why Soundview could not have simply hired its own cleaning staff or have paid only what it cost to perform the cleaning services it required. However, by paying hundreds of thousands of dollars in excess of that cost to CEDC, a company they controlled, Soundview paid for Gautier Espada and his father to live cost-free, lavish lifestyles. As the person who ran CEDC on a day-to-day basis, Gautier Espada was not only aware of this fact, but took full advantage of it.

Further, Gautier Espada attempted to conceal the CEDC scheme by lying to CEDC's accountants about the nature of CEDC expenses. For instance, an accountant testified that Gautier Espada directed him to deduct tutoring fees as a business expense. Tr. at 2021. Further, Gautier Espada falsely wrote to an accountant that a CEDC check was used to pay for CEDC's legal fees when, in fact, it was used to pay for a vacation condominium. Tr. at 2254. This evidence demonstrates Gautier Espada's guilty

---

[4] "Gx" refers to the government's trial exhibits.

knowledge that his use of CEDC funds was improper and that if exposed, would have raised red flags with the IRS or regulators and caused them to scrutinize the improper janitorial scheme.

In light of his central role in the scheme, Gautier Espada should be held accountable for losses Soundview suffered as a result of his spending CEDC funds on personal items. IRS Special Agent Hunziger testified that Gautier Espada spent $39,501 of CEDC's funds on such items, like the tutoring services mentioned above. Thus, the CEDC loss should be included in the calculation of his offense level computation. See PSR ¶¶ 22, 24 and 44.

    3.    <u>Miscellaneous Thefts</u>

The evidence at trial also showed that Gautier Espada improperly took money from Soundview and CEDC by requesting and collecting reimbursement payments to which he was not entitled. This occurred in two ways.

First, Gautier Espada paid for items with his CEDC credit card, whose bill he paid every month with a CEDC check, but nevertheless wrote CEDC reimbursement checks to himself for these items. Therefore, although Gautier Espada did not personally incur the costs of the items purchased on the CEDC credit card, he nevertheless submitted receipts for reimbursement for certain items purchased on the card. According to summary witness FBI Special Agent Geoffrey Ford, these improper "double dipping" payments amounted to $5,075, (PSR ¶ 24 and Tr. at 4054; Gx 20(w)).

Second, Gautier Espada submitted receipts for reimbursement to Soundview for items purchased on the CEDC credit card. Since CEDC paid its own credit card bill, Soundview should not have reimbursed Gautier Espada for those purchases. In fact, it was these payments, that occurred twice and totaled $988 (PSR ¶ 24 and Tr. at 4985), that comprise the misdemeanor theft count to which Gautier Espada pleaded guilty.

When totaled, these two different types of improper reimbursements amounted to $6,063.

    B.    <u>Guidelines Calculation</u>

    1.    <u>Loss Amount</u>

In calculating Gautier Espada's offense level computation, the Court should determine that a 12-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G) applies, because Gautier Espada is responsible for over $200,000 in loss. PSR ¶

53.[5]  This is because, as detailed above, Gautier Espada should be held accountable for: 1) $254,820 for his role in the rent scheme; 2) $39,501 for diverting Soundview money through CEDC to spend on personal items; and 3) $6,063 for improper reimbursements. These figures total approximately $300,384, well above the $200,000 threshold.

        2.    <u>Sophisticated Means Enhancement (PSR ¶ 55)</u>

Gautier Espada's participation in the rent scheme warrants a two-level enhancement because the scheme was "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." See PSR ¶¶ 44, 47 and 55; U.S.S.G. § 2B1.1(b)(10)(c). Both Gautier Espada and his father created an elaborate process, as well as a cover scheme, to divert subtenant payments into their pockets. First, they utilized two janitorial companies - SME and CEDC - to serve as conduits for the rental payments by disguising the payments as maintenance fees. See, e.g., Tr. at 2733-36, 3387-88. They also failed to disclose to the Soundview Board the nature and extent of their misconduct, Tr. at 3523, and did not tell CEDC's accountants about this particular source of income. See, e.g., Gx 230, 242; Tr. at 1931, 1933. Altogether, the Espadas perpetrated this scheme on nine different subtenants over a period of five years. Gx 20(x); Tr. at 4834-35.

Further, once subtenant money was diverted to CEDC, Gautier Espada spent some of it on himself and family members and even submitted non-business related receipts to CEDC so he could reimburse himself for those, too. And when accountants asked Gautier Espada what some of these CEDC expenses were for, Gautier Espada tried to conceal it by falsely claiming that they were business expenses. Simply put, the defendants went through an elaborate scheme to divert money into their pockets that should have gone to Soundview. Thus, the sophisticated means enhancement applies.

        3.    <u>Disagreements with the PSR</u>

           a.    <u>Misrepresenting a Charitable Organization</u>

The government does not agree with the PSR's inclusion of an enhancement for misrepresenting that Gautier Espada was

---

[5] PSR ¶ 53 contains what seems to be an inadvertent a mistake, adding 14 levels for over $200,000 in loss; it should only be 12 levels as per U.S.S.G. § 2B1.1(b)(1)(G).

acting on behalf of a charitable organization pursuant to Guideline 2B1.1(b)(9). We note that we did not include this enhancement in the estimate set forth in the parties' plea agreement.

### b. Role Reduction

The government disagrees with the PRS's inclusion of a minor role reduction for Gautier Espada. PSR ¶ 57. While Gautier Espada's role may appear diminished when he is compared to his father, that is not the standard by which his actions should be judged. See United States v. Carpenter, 252 F.2d 230, 235 (2d Cir. 2001)("The defendant's conduct must be minor or minimal as compared to the average participant in such a crime. Accordingly, the fact that a defendant played a minimal or minor role in his offense vis-a-vis the role of his co-conspirators is insufficient, in and of itself, to justify a [mitigating role] reduction.") Rather, Gautier Espada played an indispensable role in helping his father execute several theft schemes, and his role was certainly greater than that of a courier in a drug conspiracy. See e.g., United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) (upholding denial of role reduction and emphasizing that "[c]ouriers are indispensable to the smuggling and delivery of drugs and their proceeds."). At the very least, the evidence at trial showed that Gautier Espada was aware of his father's theft schemes, and, indeed, he tried to conceal some of them. This means that he cannot establish the lack of knowledge that is crucial to a defendant seeking to avail himself of a role reduction. See United States v. LaValley, 999 F.2d 663, 665 (2d Cir. 1993) ("A lack of knowledge or understanding is essential to a finding of minimal role, and is a relevant factor to be considered in reaching a finding of a minor role."). Lastly, courts have found such a reduction warranted where the defendant was "essentially fungible." United States v. Fernandez, 312 F.Supp.2d 522, 525 (2d Cir. 2004). Gautier Espada was clearly not fungible, and because he was Espada's eldest son, he was accorded a role in the schemes and the spoils that went with it above and beyond any single other individual.

In sum, Gautier Espada's offense level computation should be calculated as follows:

Base offense level                                       6
(U.S.S.G. § 2B1.1(a)(2))

Plus: Loss of over $200,000                             +12
(U.S.S.G. § 2B1.1(b)(1)(G))

```
Plus:  Sophisticated means                      +2
(U.S.S.G. § 2B1.1(b)(10))

Less:  Acceptance of responsibility             -2
(U.S.S.G. § 3E1.1(a))

Total offense level:                            18
```

With a criminal history category of I, the Guidelines range is 27 to 33 months. However, because the statutory maximum the defendant faces is 24 months, the effective applicable Guidelines range is also 24 months.

    B.    <u>Tax Offenses</u>

From 2004 to 2008, Gautier Espada failed to report the income he earned through CEDC above his regular salary. This meant Gautier Espada did not report as income numerous items and services purchased with CEDC checks, such a tutoring services for family members, as well as additional periodic checks issued by himself to himself. This resulted in unreported taxable income of $45,721, which the IRS has calculated results in tax due and owing of $15,628.[6]

In addition, he did not file a personal tax return at all for the year 2009, knowing that he was required to do so. While the tax offenses do not affect the applicable Guidelines range, the tax due and owing is important because, as shown below, the Court should require Gautier Espada to repay that amount to the IRS.

We note that Probation has calculated a tax loss of $7,231. PSR ¶¶ 36, 43, 45, 60 and 122. This is based upon income earned from Bio-reference Laboratories. PSR ¶ 36. We believe that our figure is more appropriate, and should be adopted by the Court.

---

[6] The tax loss is generally calculated as 28% of the unreported gross income plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made. U.S.S.G. § 2T1.1. The Court need only make a reasonable estimate of the loss given the available information. U.S.S.G. § 2F1.1, application note 8.

9

II. <u>Restitution</u>

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, requires the imposition of restitution to victims of certain crimes. The Court must order restitution in the "full amount of each victim's loss without regard to the defendant's economic circumstance." <u>United States v. Pescatore</u>, 637 F.3d 128, 138 (2d Cir. 2011); 18 U.S.C. § 3664(f)(1)(A).

Here, the Court should find that Gautier Espada's illegal conduct resulted in losses of $988 to Soundview, and order Espada to pay restitution in that amount. While this amount falls far short of the loss that Gautier Espada helped cause and differs from the loss amount for Guidelines purposes, Gautier Espada was not convicted for his role in those schemes. Absent an agreement by the parties, the Court may order restitution only for losses attributable to the offense of conviction, not for related conduct. <u>See</u> <u>United States v. Silkowski</u>, 32 F.3d 682, 688-89 (2d Cir. 1994); <u>see</u> <u>also</u> 18 U.S.C. § 3663A(a)(3). Here, $988 is the amount associated with his misdemeanor theft offense of conviction.

However, because Gautier Espada's plea agreement permits restitution for taxes owed for the years 2004 through 2011, the Court may order restitution to the IRS in the amount of $15,628.

In sum, the Court should issue restitution orders specifying that Gautier Espada pay $988 to the Clerk of the Court and $15,628 to the IRS.

III. <u>A Sentence of 24 Months Is Appropriate Under § 3553(a)</u>

Pursuant to 18 U.S.C. § 3553(a), a sentence of 18 months' imprisonment - Probation's recommendation - is warranted. Two 3553(a) factors are particularly relevant in this case: (1) the need for the sentence imposed to reflect the seriousness of the offense and to promote respect for the law; and (2) the need for the sentence to afford adequate general deterrence to criminal conduct. 18 U.S.C. §§ 3553(a)(2)(A)-(B).

Although Gautier Espada's offenses of conviction were misdemeanors, they were serious ones. Gautier Espada not only benefitted from his father's schemes, he furthered them. <u>First</u>, by appointing Gautier Espada as both the day-to-day head of CEDC and Soundview's Director of Environmental Care, Espada ensured that the rent scheme went undetected for years, diverting $254,820 from Soundview's coffers. <u>Second</u>, Gautier Espada significantly benefitted from and helped further his father's scheme to use CEDC

to siphon Soundview's funds. Indeed, the trial evidence showed that one of the main reasons for diverting funds to CEDC was to provide Gautier Espada with living expenses as well as an extra salary. Thus, Gautier Espada received two salaries for doing the exact same job. Not satisfied with his double-salary, Gautier Espada used CEDC as his piggy bank, falsified receipts and lied to CEDC's accountants. Third, Gautier Espada stole from Soundview and CEDC through his "double dipping" and CEDC credit card reimbursements schemes. His betrayal of a non-profit meant to serve the poor is a serious crime and should be treated as such.

Moreover, Gautier Espada's tax offenses were serious, involving both the failure to report income on tax returns, and in 2009 failing to file a tax return at all. From 2004 to 2008, Gautier Espada failed to report as income the $45,721 in items and services he purchased with CEDC checks, such a tutoring services for family members, as well as additional checks he wrote to himself. Thus, his tax conduct is serious and deserving of a stiff punishment.

We anticipate defense counsel will argue that Gautier Espada does not share the same degree of culpability as his father. We agree. For this reason have joined in the PSR's recommendation of an 18-month sentence, rather than the Guidelines range of 24 months' imprisonment. However, Gautier Espada was no mere bystander to his father's crimes. Entrusted with significant responsibility as one of Soundview's senior staff — not to mention its head of compliance at one time — he had a duty to ensure that Soundview's public funding was not stolen or squandered. He was in a position to both know of his father's malfeasance and do something about it, or at the very least distance himself from it. Instead, he embraced it. From collecting rental payments to using CEDC checks for personal and family expenses and then telling CEDC's accountants that they were business expenses, Gautier Espada not only enjoyed the fruits of his father's schemes but furthered them. Having lost sight of Soundview's noble purpose, he viewed Soundview primarily as a money making vehicle, and tried to profit from his position in any way he could. Further, Gautier Espada has only himself to blame for failing to file a tax return in 2009, and for failing to report as income the CEDC checks he should have declared.

In sum, Gautier Espada's sentence should serve to punish him for his serious offenses, and to deter others who would contemplate not filing tax returns or abusing their positions at non-profits for self-enrichment.

11

IV. Conclusion

For the foregoing reasons, the government respectfully asks the Court to impose the period of incarceration recommended by Probation, to wit: one-year on the tax count, to run consecutively to 6 months on the theft count. We also request that the Court hold Gautier Espada responsible for $988 in restitution payable to the Clerk of the Court, and $15,628 in restitution to the IRS.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: _____
Carolyn Pokorny
Todd Kaminsky
Assistant U.S. Attorneys
718-254-6291/6367

cc: Defense counsel (via ECF)